The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oh, yay, oh, yay, oh, yay. All persons having any amount of form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the court is now sitting. Godspeed, United States and this honorable court. Thank you. Good morning, everybody. Mr. Lynn, you may proceed. Thank you, Your Honor. Good morning, and may it please the court, my name is Albert Lynn, and I'm here on behalf of Justice Loughry. The only question in this appeal is whether the district court should have held an evidentiary hearing, in light of the Twitter activity of one juror, Justice Loughry's criminal client. We've offered several bases for that hearing, but I'd like to start today with the ground we've highlighted in our petition for this hearing, which is that a hearing was required under the Supreme Court's decision in Remnant, this court's decision in Barnes. Both the district court and the government set the bar too high for a Remnant hearing, requiring proof that Juror A actually saw highly prejudicial information on social media, rather than merely asking whether Loughry had made a genuine and credible allegation that this had occurred. If adopted, that novel requirement would significantly undermine the ability of criminal defendants to, as this court said in Barnes, uncover otherwise unknowable facts to prove a six-month violation. This court explains Barnes... Counsel, this is Counsel. Yes, Your Honor. Counsel, this is Judge Agee. There was quite a bit more direct evidence in Barnes than you have here, but my first question is, in the context of your argument, when the court's examining whether or not there is a credible allegation of external evidence of an improper juror contact, is that limited to Twitter contacts, like we have in this case, because of the way that service provider operates, or is it broader to cover all types of social media? Judge, I want to make sure I understand your question. As to the standard of a genuine and credible allegation, are you asking whether that applies only to Twitter or to all social media? Is that correct? Yeah, that's correct. Somebody has to write an opinion on this case, and as I understand it, Twitter operates somewhat differently than other social media. So, what I'm asking you about is whether or not your argument covers social media and Toto, or whether it's limited to Twitter.  Thank you, Your Honor. Our argument is that that is the standard that this court set forth in Barnes. So, to answer your question directly, I would say the genuine and credible allegation standard applies in all cases. Now, the facts, of course, of any particular Remmer claim, Remmer case, are going to vary. And we do think that the unique nature of Twitter, Judge Angie, as you referred to, the fact that it is not necessarily chronological, that tweets are basically permanent unless you actively delete them, so they can sort of show up unannounced in your feed, those are all things to take into account in the highly fact-intensive analysis for a Remmer hearing. We think they weigh in favor of a hearing here. They may weigh in favor of a hearing in many cases that involve Twitter, but we don't think as a general matter that the standard differs from case to case. We think that's the standard this court has long adhered to, was articulated, I think, very clearly in Barnes, and would apply to all cases, whether it's Twitter, social media, or even traditional media, newspaper or television. It just may be, depending on the facts, more difficult to meet, and we think the fact that this involves Twitter is one element that sort of militates in favor of a hearing here. Social media is a very different context to this whole area of Remmer investigation. So, for instance, in Barnes, you had three jurors, including the suspect juror who made statements. So you had really direct evidence in that case, but in social media, I'm curious as to your view as to how counsel in a particular case, criminal or civil, is to find out about that. I mean, is it your view, for instance, that jurors voir dire would include requests for the court to require the prospective jurors to turn over their devices, their electronic devices, for review by counsel? Your Honor, the short answer to that is it's not what we're asking for as a prophylactic matter. I think your point is the point that we have tried to make here, which is that it is much more difficult in the social media context and with respect to Twitter specifically, to get the kind of direct evidence that you might get in other cases. Although I will say it can also be very difficult to get direct evidence that say somebody has watched a television broadcast or a news report in their house at night. But, of course, we as a judicial system need to balance the needs of the jurors and we don't put them in a plastic box in every case. We don't sequester them in every case because that's a balance that the judicial system has decided to make. And that's the reason why grammar exists. But I think if you have the evidence, in some cases, your Honor, it's going to be direct, as you point out. But in many cases, it's going to be difficult for it to be direct. And I think Twitter is certainly one of the mediums where it would be very difficult, barring somebody actually seeing the person doing it and testifying to that, which I think is very difficult with the way that you can read stuff on your phone these days. Council, let me ask you this. Evidentiary hearings can become a little bit of a fishing expedition. And I'm worried about, I'm concerned. Rimmer serves a definite purpose and I understand that. But I'm concerned about pushing Rimmer too far. And when we start holding evidentiary hearings and probing this and probing that, I'm wondering whether we put really very heavy burdens upon jury service. Because you have to need to remember that these citizens who serve on juries are taking time from their personal lives and are disrupting their personal schedules, all in the service of a very noble civic obligation. But if in addition to hearing the case, which sometimes can go on for quite a while, they're going to be subject to a bunch of post-verdict procedures and post-verdict probes and all the rest. Are we putting an unwarranted burden upon jury service? The federal rules of evidence warn us against that. And I just think when we are requiring evidentiary hearings with a little more than we have here, what is this going to do down the road to the willingness of our citizens to give them their time in jury service for the criminal justice system? I understand your concern, Your Honor. But I think, as you were pointing out, it is a balance. And we do need to protect the rights of the defendant, in particular in criminal cases. And so we do, as a judicial system, make certain judgments about how much of a burden we're going to put on jurors, either as a prophylactic matter by sequestering them or giving instructions or telling them not to be on social media. What's your limiting principle if we drift too far into the speculative? And if we hold evidentiary hearings on the basis of speculation of what might be or whatever, what's your limiting principle? How do we keep this from becoming an unwarranted burden? What would you do to limit this? I understand, Your Honor. That would be my next point, which would be on this end of it. Remmer exists, and we apply it, I think, in every case. And you have to—it's a fact-specific analysis. And I think the answer to your question is it's not speculative here. There are a number of facts all taken together. I think one of the most important ones that may not exist in every case is that there was documented interest by the juror in Justice Loffrey leading up to the trial, not just interest but intense interest and not just intense interest, but on this very platform. So it's not as though she had passing interest in Justice Loffrey in a newspaper. Of the 11 times she chose to publicly interact with tweets on Twitter in the four months leading to trial, four of those involved Justice Loffrey. And I think that is an important fact here that in future cases could be a limiting principle, that you have not just the fact that she had the means and opportunity, meaning that she had access to Twitter, she used Twitter, and she followed reporters who tweeted 73 times between them about—and some of those tweets, I think, were classically prejudicial statements. Mr. Lynn, let me ask you this. Don't we do that by the fact that she was asked, of all the knowledge you have about this case, impeachment, would it prevent you from giving a verdict based solely on evidence? She said yes, it would. Don't we do that with all jurors? We do ask that of all jurors. Why do you think that when a district court judge heard her and counsel didn't do much of a voir dire when they had an opportunity to go further, why is it not sufficient when she said that as to prior, the four months prior, whatever that was, I'm going to decide this case based solely on the evidence? That's what she said under oath, correct? Yes, Your Honor. All right, so now, my question is this. Let's get back to Rema. Of course. You said the balance. Well, the balance is you don't have to show prejudice to get the hearing, but the other balance is this. The Supreme Court said we're looking for protecting the sanctity of jurors to be free from the possibility of outside, unauthorized intrusions purposely made. And therefore, we're looking for improper contact about the case with the juror. So you do have to show improper contact, not just contact. What was the improper or the violation of the juror? Your Honor, the improper contact here was the juror going out and reading information about that could be prejudicial. And I think this is no different. Reading information? What information did the record say she read? There were tweets. During the trial. During the trial about the case. There were tweets by these two reporters, Mr. Bass and Mr. McElhaney. I said that she read that information. And that is the question here. That's what I'm asking you. I don't think what Rema requires is proof that she read this. I think it requires a credible allegation. No, it requires improper contact. If someone wrote something and there's no evidence that someone read it, how is that improper contact? Now, it may be, are you saying it's improper for a journalist to write about it? I thought the question is whether or not she read it. Your Honor, we think that what this court has said, and I think in Barnes and other cases, is not that there's proof of improper contact, but that there is a credible allegation of improper contact. No, in those cases, for example, in Rema, there was a proposed bribery. That is, you know, if you have out here, then maybe you can help yourself. In Harry, improper was imputed to the juror because they said only a juror would research. Because a juror can't research information, but that was imputed to the juror. And in other cases, dealt with jurors collectively making the information. Another case in the Fourth Circuit said a person went to their pastor and asked for their definition. Whether you have the improper contact or conduct on the juror's part here, or anybody that could be inactive could be imputed. You see, you can't have speculation upon speculation, because that would mix the balance in improper contact. Your Honor, two answers to that. Mr. Lynn, can you answer the question? And then just this. Go ahead. Of course, Your Honor. Two answers to that. As for Harris, I don't think it was simply imputed. It was the juror's live-in girlfriend who viewed the information. But there was no direct evidence there that the live-in girlfriend had seen or read anything about the child. The only evidence in Harris was that she had read the LinkedIn page of the defendant. And the LinkedIn page, Your Honor, as I'm sure you're aware, is simply an online resume. And there was no evidence that she had seen anything about the child. It was assumed by the Sixth Circuit that she had gotten to that LinkedIn page by Googling the juror, and that on the Google page, as the defense counsel said, by doing it himself, there was prejudicial information about the trial on that Google page. So it was assumed that the live-in girlfriend had seen this prejudicial information. And then, Your Honor, as you point out, it was then assumed that she had then conveyed that information, again, which was no evidence that she had actually seen, to the juror. So I think Harris is actually with far less compelling evidence than there is here that the actual contact occurred. Judge Diaz has a question. Thank you, Your Honor. Well, it was going to be more of a hint, and you've taken it, Mr. Lynn, that we look to Harris. We can disagree with the result in Harris, I suppose, and suggest that it was wrongly decided. But as you have pointed out, there was no direct allegation of communication, just a possibility that it had occurred, and that was by itself sufficient to warrant the hearing. But I guess we need to get back to the nature of the technology here, right, because it's the very nature of the technology that prevents you from making that direct connection to the chief judge. And I don't blame my colleagues for wanting that, but I think we need to look at the nature of the technology here and understand it, to know that it's just impossible to do more than what the defendant did in this case. And I want to get back to a point that Judge Wilkinson made about the importance of jury service. As someone who presided over a number of trials as a state trial judge, I don't minimize at all the burdens that we place on jurors. But it's also important to recognize that jurors take an oath to comply with their obligations to decide a case fairly and impartially. And if we have a credible allegation that a juror failed on that oath, I think we would be doing a disservice by not pursuing that, simply because the nature of the technology doesn't lend itself to the kind of direct proof that has historically and conventionally been part of the analysis. So I think we need to focus on the nature of the technology here. And I think limiting principle, as you have pointed out, is just not the notion that a juror is on Twitter. That can't be enough, because God knows we'd never be able to impanel a juror if that was the test. It's the confluence of facts in this case that, in my view, warrant at least further probing and questioning. Now, here's the question. If a majority of the court agrees with that, what would an evidentiary hearing look like in this case? Is it going to be simply putting the juror up on the witness stand and asking her directly? Because I imagine, I think you know what the answer is going to be. But what more do you anticipate the court could or would allow in such a process? Yes, Your Honor. I think you could ask, obviously, the direct question would be, did you see these tweets? And you could identify particular tweets. But I think you could also ask her about her other Twitter activity to assess the credibility of her answer. If she says, I don't remember reading this or I didn't read this, do you remember reading other tweets during that time? What do you remember of your Twitter activity? And then there's a judgment call to be made as to what her answers were as to whether she was exposed and what her credibility is as to her memory of what she saw. But, Judge Diaz, I think your point is exactly right. And I think one of the things that I want to stress is I do think that the standard is a credible allegation of actual contact. And I think that makes sense. Can I ask a question? Yes, Your Honor. I think Judge Niemeyer is also trying to speak. He's on mute, so I'm going to take that opportunity to go ahead and ask a question. So I want to return to the Chief's earlier point. He quotes Rimmer as requiring a purposeful activity. And if we read 606B2, it requires that the outside influence be brought to the jury. It requires some affirmative action. And if we look at all of the cases that the Chief discussed, they're not passive receipts of publicly available information. They're attempts to bribe or they're contact with a pastor that's directed. It's purposeful activity. We don't have anything purposeful here. And so help me understand, what do I do with that? Why does that not make your case different from all of these other Rimmer cases? Your Honor, I don't think the purposeful element means simply that it's purposefully brought from the outside. United States v. Lawson, from this court 2012, involved the reading of a Wikipedia entry by a defendant and not something that was brought to, I'm sorry, by a juror. Not something that was brought affirmatively to the juror, but that the juror, him or herself, went out and read the Wikipedia entry. I don't think that's really any different than what we have here, which is that you've got a juror who, again, we think, given the confluence of facts, and in particular the interest in justice law free on this very medium ahead of time, is what creates the credible allegation that she went out and read these tweets, saw them, read them. And there's a question here. So, Mr. Lynn, to follow up on that, and this kind of involves, I guess, several of my colleagues' questions, but if someone had been reading the Charleston Gazette about this, and that was known, and they took the oath that said despite that they could be fair and swore that they would do that, and the judge instructed the jurors not to read news accounts or watch TV about the case, and someone says, I saw Juror A reading the newspaper, and the only information was that they were reading the newspaper about an unrelated event. Under your theory, would that warrant a rumor hearing? No, Your Honor, and I think it really is, again, a question of what facts you have. If you know, for example, that the juror was reading a particular section of the newspaper on a particular day, and you know that there was an article in that section, I think that might be enough. Or if you know that she had a proclivity to read in the newspaper about justice law free, then again, I think that would be an additional fact, the same medium, the same interest that would be helpful. But, you know, for example, the government cites the case Tungstall from the Eighth Circuit, where the allegation was that there was just a juror, not even a juror in the particular case, had been seen in the jury room reading a newspaper. No allegation as to what the newspaper was. That is not enough, and we completely agree with that, but we think that the facts we have here are very different. Now, I do want to stress this point, which is what is the consequence if these facts are not enough? In what case? Let me ask you, Mr. Davis, a question. If we focus on the trial, the contact during trial about a matter relating to the trial, the evidence in this case is that the juror had two tweet engagements, both about football. There is no evidence that she had any other tweet engagements or that it was about the trial. Now, the question I have is if we just limit to that aspect, wouldn't every juror be subject to a Remmer hearing? Because my suggestion is that every juror or most jurors are participants in social media. And during the course of the trial, you say there was reporting on the social media by the newspapers and the reporters, but that is the same for every juror. So, the question I'm really asking is where do we draw the line if we're not going to require a specific contact? And your argument, as I hear it, is okay, the summer tweets. Well, the summer tweets were four tweets over the period of four months, one a month. She went on tweets only 11 times the entire summer. That's two, three times a month. And the tweets they had during the summer were just about the investigation and what the legislature was doing. It was not about the case. So, you're arguing that her four times during the summer, average of once a month, is enough to impute to her during trial that she acted with misconduct. And I'd just like to know where the line is because it seems to me this type of conduct during trial where we had two tweets involving football and that's it. How we call her in for a hearing and why don't we call in all 12 jurors? Chief, I see my time has expired. May I add something? Yes, you may. Your Honor, if I could, just two responses. The first is if you do take just the evidence during trial, I agree with you that that is not enough. But I don't think you can just take the tweets during trial. I think you have to look at all of it because it speaks, it is evidence that speaks to what she might have done. As to the stuff beforehand, I think it's important to remember the nature of this technology. The 11 times are the times that she publicly interacted with a tweet. That is not the number of times that she was on Twitter. Many people are on Twitter all the time and don't do anything that leaves a public trail. So, our point is of the 11 times that she saw an interest in something enough. No, you don't have a lot of evidence and we never do. We don't know how many times a juror walks by a newsstand and reads the headline. We can't know that. The problem is that we're in a trial and to establish some kind of prejudice, you have to come up with evidence. You don't just speculate. Now, this woman went on four times over the period of four months. That's what we have. And the four times were quite innocuous. They have been reported. We reported those in the earlier opinion, the panel opinion in this case. And she indicated after she'd seen those four, which were not about the case but about related matters, the ethics violation and the impeachment violation, she saw four times during the summer and she said that wouldn't influence her decision on the case. She listened to the evidence. Of course, as we know, she participated in an acquittal on several counts and did listen to the evidence. But I get to the point where what troubles me is why shouldn't we, on the basis of your type of allegations, have to bring every juror in following a trial to make sure they didn't go and search out improper information during the course of the trial. And we just don't have that. And it seems to me the line, I understand the fear you have. There's increased risk. There's no question. But the question is where are we going to draw a line if we don't require evidence of at least one contact. It's improper. And we don't have that. We're speculating. One sentence, Your Honor. The one sentence response, Judge Niemeyer, is that the proper context is it's four out of the 11 times that she chose to publicly interact with Twitter. That's nearly 40%. It's actually 36%. That shows an interest, a public interest, an undisputed interest in this particular defendant that you may not have in every case. So, counsel, what is the answer to this? Are we driving courts in the direction of saying that I don't know what sequestration is going to look like in the future, but it might be like this. If you're going to sit on the jury in a case where there's a lot of publicity the way there was with this one, you've got to check all your iPhones and check all your cell phones and check all the technology that you have on your person with the court and put it into some kind of safe in order to cut off the possibility of this sort of evidentiary hearing. Because district judges will be very sensitive to what we say and say, oh, well, we've got to avoid this. And as a way to avoid it in a heavily publicized trial, just to say to check your iPhone, to check your cell phone, everything, if you're going to sit on a jury, is that what we should do? Your Honor, I think that that's one way to avoid this kind of contact, which I think is something to be concerned about because I think the prejudice that comes from an individual who reads Twitter passively is the same or perhaps worse than the prejudice of someone who actively interacts with a tweet. I'm sorry, Your Honor. Yes. Mr. Lin, if I could add to that thought, to what extent do we put into the mix the fact that the district judge found that she had potentially been either untruthful or inaccurate in answering question number six concerning her past exposure to social media and the fact apparently said she had not heard anything from Twitter when we know, in fact, she had been exposed to Twitter in the past about this trial? I haven't heard you say anything about it, and I know it addresses in part your McDonough argument, but it seems to me that arguably that does factor into the mix here. Yes, Your Honor, I think you could take that fact into account. I haven't mentioned it because I do think it speaks mainly to the McDonough claim and whether there should have been a hearing to inquire into her- Right, but why doesn't it make a difference? In this case, if we know that the juror was asked about whether she had seen anything on Twitter, she didn't respond that she had, and now we know that that was inaccurate. I agree, Your Honor. I do think it is- I'm sorry, Your Honor. Yes, I do think it is a factor that can be taken into account. We don't think we need it. I do really think, and I know some judges think differently, but I do think that the four out of 11 tweets activity that is publicly documented ahead of time, that's a fact that, again, you're not going to see in a lot of cases, and I've gone well over my time, and so I will save my further answers for rebuttal. Chief, I have- Please, Judge, go ahead. Go ahead, Judge Mutch. I just have one question because I'm not very technically, as my colleagues can tell you, technically alert, but my understanding is you can be on Twitter without ever having it show that you've looked at a message. Is that correct? That is absolutely correct, Your Honor. And so this person could have been on Twitter for everything and seen everything. We don't know definitively, but we know she followed those people, so it would automatically come up. That's right. We know she followed those people. It would have come up in her feed. It doesn't come up necessarily chronologically, so she could have seen it on a different day as well. Yes, Your Honor. Thank you. So my question goes, you know, whenever we wade into developing technology with traditional legal jurisprudence, our understanding of how it works is critical to it. We can't just do it as though we're looking at a newspaper and we're looking at items. For instance, you know, to say someone looked at something four times or that she tweeted 11 times, that means she liked the tweet. And we've got to look into what is fed into this Twitter algorithm. And when you're looking at the technology here of what a Twitter represents, and that's important because we all know Twitter can be tremendously influential. Here's your limiting principle. Not every juror is going to follow a reporter in terms of what they're tweeting. That's the limiting principle. And if we start out with this notion that we're going to put our hands down in the sand and say, well, you know, she only did it during trial during this time period here, the purpose of the hearing is to find that out. And it's a simple hearing. It's not like you've got to reinvent the wheel on it, and Lord knows maybe I'll trial judges and we'll overwork, but I don't see it, I mean, in terms of the number of cases we deal with. Just conduct a simple hearing. And when you conduct a simple hearing, you will find the answers. But to begin this process as though you understand the Twitter technology in relation to social media and not inquire as to, well, she's following these reporters, which you should be doing, and not every juror is doing that. And so when you get into the whole question of the technology here, that's the problem here with this case is we don't know. And the answer from maybe some of my colleagues would be, well, don't look. Because, you know, she hasn't said anything. And if you don't look, yeah, you won't see anything. But it doesn't work that way in 2021. We're not back 30, 40 years ago. We're dealing with a whole different world in terms of technology. And when you've got people who are following people online who ought to be making decisions in the case, and these are people who are reporting on the case, why not simply just ask the question? And that's all you've got to do. And then the judge can make a decision. But you just blow it aside and don't do it. I don't get that. I don't understand. Because I don't think it limits itself. And maybe correct me. She just looked at it four times during the trial where she just looked at it.  I mean, how do we know that? What we know are the likes. And if you know the difference between likes, what is the difference between liking a tweet and following the tweet? Does that mean you only just looked at the likes? Certainly not. And that's the inquiry here. I would like a response to that. Yes, Your Honor. And that is the concern. When you see a tweet, there's no public trail. If you like a tweet, it means that you've affirmatively decided to indicate publicly that you not only saw it, but you liked it. Now, what does like mean to a particular individual? That's not clear. But that leads the trail that you've actually seen it. But just because you didn't like it doesn't mean that you didn't like it. Yes, Your Honor. Judge Wynn and everybody that spoke raised good points about technology. But here's the question, my biggest. Help me with this. Of course. It seems like you're punishing her for being an avid reader, an avid follower, if you will, just like people who read the paper. You're right. 40 years ago, people read the newspaper. That's why you say, did you read anything in the newspaper? In fact, no, I didn't. You can move on. Now it's that. The question here, it seems like you're punishing her about pre-jury. She's not a juror. She's a free citizen before she's on the jury. In this case, you knew, I'm imputing to you, your side knew that she knew something about the impeachment. You knew there was an overlap in the facts of the impeachment in this case, end quote. And you had an opportunity. The judge did a great job in giving you a chance to go at it. You asked further questions. You didn't ask what was the source of your information about impeachment. You didn't ask anything about social media. You didn't ask who it was. You had that opportunity to do it. Now that it's over, you want to take her non-jury contact and following and say now you can put her through the gauntlet of questioning when you had the opportunity to do so yourself. And you don't have any evidence that she read any tweet as a juror. You're saying, well, because she did this before, it's likely she did it again. Is that enough on a rumor? When they were looking for improper contact? That's my question. Thank you, your honor. A couple answers to that. I think the first is the question of the voir dire and what happened in her honesty during it can be relevant. But I think it's important that the voir dire and the questions and her answers there are not being used to immunize somebody from the potential rumor hearing down the road. Rumor is an independent protection against what might happen once somebody is impaneled on the jury. Now, you know, perhaps she shouldn't have been impaneled. And that's the point that we're making here. But I think it's separate and apart from what happened there. If you've got other people in a different case where maybe there isn't the same question, but they get impaneled. Rumor is a separate protection against what happens once the jury is impaneled and what those people might have interacted with. And I think one of the points that I want to stress here is the reason why the activity ahead of time is so important is because it does show her motive and her interest. And without that, it will be very, very difficult in a future case ever to have any inquiry into a juror's passive Twitter activity. And passive, I think, is a really important point here. Judge Niemeyer has pointed out, look, if someone had liked something during the trial, then you would know, of course, that she interacted with that. And that would be a different case. But what do we do about the cases where there's only passive activity and yet there's lots of evidence that shows that it's very likely that she came across this information? 73 tweets. And so going to that point, and Chief Judge Gregory alluded to this in terms of the technology, but I don't think we can be dismissive of the technology here. We can't just bring in a newspaper. That has nothing to do with a Twitter account. We can't bring in the traditional means of communication. We're talking about a Twitter. We're talking about the type of indication that's an indication. It's a red light. You have been following these folks here. They have been writing about the trial. This is what you liked over here. Doesn't mean you haven't been looking at the whole thing. The likelihood, what it indicates, is there's a strong indication you've been doing this the whole while. The only purpose of the hearing is all these questions that are being asked, just ask the question. And that is it. To answer, I think, Judge Wilkinson's question, there is a much less intrusive prophylactic approach here, which is to have district courts direct jurors to use filters on their Twitter or to unfollow the reporters. So you can actually put in a filter for certain words. Could have filtered out law free. Could have filtered out, you know, a bad. All I'm saying is it's an uncomfortable place to be in 2021, but there are, if we don't put a stop to this sort of thing now, then it is going to open the gate in the other direction. The limiting principle is what is being advocated here. We need to limit this right now. If you don't, then you are opening it up to, well, why not? Just do it. And you don't know. You just don't have to like it. Just go ahead and just follow whatever you want to follow during the course of the trial. And there won't be any hearing or inquiry because there's nothing that's pointing to it directly. I will just add to the importance of this. And again, I know I've gone over my time, but I'll just say very quickly, this very same issue is before the Second Circuit right now in a case called, I think, Guzman Loera. It's come out of, I think it's the Eastern District of New York. It's not fully briefed. There's a reply brief that's due on May 11th. Thank you, Chief, for the extra time. Thank you, Mr. Loon. Mr. McVeigh. And police support. I'm Greg McVeigh. I represent the United States. The defendant's contention that there is a credible allegation of unauthorized contact with reporters' tweets in this trial is nothing more than speculation. The defendant provided no evidence whatsoever that this juror had seen any tweet by this reporter during trial or at any other time. There's no indication she's ever liked a tweet by either of these reporters. No indication she's retweeted a tweet by these reporters, particularly during the course of the trial. And that's where the focus should be under rimmer. The defendant never even provided the tweets to the district court that the reporters, Michael Haney and Bath, had during the course of this trial. The burden here, or the standard of review, rather, is abuse of discretion. The district court looked at what was provided to the court. It made a decision based on the facts that were presented to the court. And one cannot say that the court abused its discretion when there was just simply no evidence presented at all, circumstantial, direct, or any other way, that this juror had been in contact with through Twitter with the two reporters. When one looks at even the tweets that were made during the course of the trial, I believe the defendant in footnote 7 of his brief alluded to some of those tweets. There were nine about the trial. If you look at what those tweets concerned, nine about the trial from Michael Haney. Those were merely sort of headline types of tweets. There was a 15-minute break, or Justice Loffrey is arriving at court or leaving court. It was barely announcing what had happened during the course of the day. Mr. McVeigh, can I ask a question as Justice Diaz? What more, in your mind, would have been required in this case for the defendant to have made out a proper claim for a Remmer hearing, given the nature of the technology that we're dealing with? I think if there was some indication that the juror had had liked the tweets, or even in comparing it to what happened in the United States versus Harris, which the defendant relies upon, there was somebody in her household who was tweeting that had come to the fore somehow during the trial. But of course, in Harris, there was no indication that that information had been, at least no direct evidence, that that information had actually been passed on to the juror. But the Sixth Circuit in that case was willing to make the inference, based on all the relevant facts, that that was enough to warrant a hearing. You mentioned earlier that you focused on the trial, but it's true, isn't it? We talked at length with Mr. Lind about her Twitter activity before the trial. You would like us, I think, to ignore that, but we can't. I believe, respectfully, Your Honor, it is irrelevant. There were other jurors who had indicated knowledge about the trial itself, knowledge about the impeachment proceedings. Those jurors were called to the bench for individual lawdeer about that. The defendant, for whatever reason, chose not to call this particular juror up. Two of those people who had indicated they had prior knowledge of the case ended up on the jury, and this juror was one of them. No, Mr. McVeigh, certainly I understand that. You know, the fact that prior knowledge by itself is never enough to warrant excusing a juror unless they can't set that information aside. And having received those assurances, I don't fault the district court for not excusing the jurors. But my question is, why would you have us ignore the Twitter activity that had occurred before trial and deciding whether or not what happened during the trial or what the defendant uncovered post-trial is enough to warrant a remedy? You want to take those in isolation, but I don't think that that's appropriate. Well, I would respectfully disagree. I believe that her pre-trial activity, which, again, had occurred months before, did not involve any contact with either of the reporters in question here. They were tweets about the impeachment proceedings from a couple of legislators as well as a private citizen. Some of those tweets concerned other state activity that had nothing whatsoever to do with Justice Lafrey and the impeachment or the trial itself. The jurors, again, were quick enough to follow the law, to only listen to the facts presented at trial, and jurors are presumed to follow those instructions, and we can presume that here. Without further indication that there's some sort of activity by this juror to be solved. Counsel? Yes. Sorry, Counsel. It's Judge Harrison. I think I can probably anticipate your answer to this question. But I'm struck by the fact that not only was the juror sort of actively engaging on this issue on Twitter before the trial, but I think it's like the second she gets out of jury service, she's back on Twitter tweeting about the trial. I'm not saying there's anything improper about that, but when you look at all of the facts in this case, she does seem to be, and not judging, but just a person who's actively engaged in Twitter about this issue. And so if we're trying to figure out whether it's credible that someone like that, given that she is following these reporters, they're in her tweet, in her feed, would look at those tweets during trial. So why doesn't all of that factor in? Again, because there has to be some allegation that that actually occurred during trial. Well, there is an allegation, and the question is whether it's credible. And it just, I don't understand why in determining whether or not it's credible, we wouldn't look at everything we know about Juror A and how she engages with Twitter about this issue. But again, there's no activity during the trial from this juror that occurred about the trial. Again, her activity on Twitter is about football. On October 6th, that was a Saturday, there was not even a trial happening that day. There were no tweets from Bass on that day. There was a tweet by Michael Haney, I believe, on that day, talking about him taking home pens and notebooks from work. Mr. Counsel, if I could interrupt, does your answer have to be that you ignore the pre-trial activity or the post-trial activity? I mean, it seems to me it's a pretty far stretch to say you can't look at anything that happened pre-trial. Is it the answer that the standard to review is abuse of discretion? And the district court, who was closest to this, looked at all this information, looked at all the factors we're talking about here today, and decided that given the totality of information, one was not required. You're not asking us, maybe you are, if you are, please tell us that we have to decide with you, we have to draw some wall between what happened pre- or post-trial. If you're saying that, please let us know, because it seems to me you don't have to go that far. No, I'm not saying that. What I'm saying is that even if you look at that and you take her pre- and post-trial activity into consideration, which I do believe, as you stated, that the district court did, and I guess it's considering the weight of that evidence as opposed to whether or not it could be considered, it just doesn't carry much weight, and you are correct. The district court considered all that. The district court, who, as you stated, had contact with her, had contact with the trial, and reviewed all the evidence that was presented, considering whether or not that allegation of unauthorized contact was indeed credible, and concluded that the defendants just did not present that. And one cannot say that the court abused it in looking at that. Counsel, can you answer Judge Diaz's question to Mr. Lynn? And the particular one I'm thinking about is, what does the hearing look like? Assume you lose. These are hypotheticals. But assume you lose, and it goes back. Talk to us a little bit about your colleague, Mr. Lynn, suggested a fairly wide-ranging set of inquiries, and I'm curious, in light of 606B, what your view of the sort of scope of that inquiry looks like. Well, I think this is one area in which we substantially agree, because as what my colleague argued was, there would be questions about whether or not she had seen this, and what that ends up being, in the United States' mind, is in essence a phishing expedition. It's that they're using the hearing itself to develop a credible allegation of that unauthorized contact, and that's what that hearing would be for. And that's just simply not what REMR stands for, that that has to occur before a hearing is granted. And again, once that hearing is granted, then, there is a very strong burden on the part of the United States to rebut the presumption that that unauthorized contact was made and that it somehow influenced this juror's decision. And that is a problem when we have jurors who perhaps have Twitter contact. During the course of the trial, there's nothing there to show that they've had any contact with reporters, that sort of thing, and that becomes a problem, because we cannot just call in jurors after the fact to determine whether or not they had any contact with reporters. It would not be unusual for somebody on Twitter, I would say, to follow the news of some sort. This was a highly publicized case. Can I ask a question about the record? Yes. What did the district court have for it with respect to post-trial contact and with respect to the reporters posting during trial? There were no tweets provided to the district court that were tweeted by either reporter. None of those were provided to the district court. There was information provided to the district court about post-trial tweets, and again, the district court said because it was post-trial, I believe there was a mention of this juror tweeting that she was glad the trial was over, or words to that effect, or was privileged to serve on that, but the district court considered that it was post-trial and there was nothing wrong with that. That wasn't any sort of contact that this juror may have had with an outside source. Mr. McVeigh, was there any dispute that these reporters were reporting daily, constantly, about the trial and that they were doing so on Twitter? There really wasn't any dispute about that. There is no dispute about that. That's true. Okay. So one of the other things that I have... I'm sorry. Go ahead. I'm sorry. Go ahead. We would concede there was active reporting about the trial, but again, one has to consider the nature of that reporting. For example, Bass reported that he would update about the trial on the evening news. That was the entirety of one of the tweets, but there was an active reporting about the trial. Our dispute is whether or not this juror had seen any of that, followed any of that, and there's just no evidence of that. So one of the concerns that I have about this case is sort of the notion of the implication of the district court's opinion that, in my view, and of course my colleagues disagree, essentially required some direct evidence of what it is that the juror was engaged in. Do you dispute or do you disagree that a defendant might be able to make out a rumor hearing without relying on direct evidence, simply relying entirely on circumstantial evidence? Yes. I would agree with that. In fact, United States v. Harris, I think, stands for that, that there was circumstantial evidence. Because of the nature and sort of the nature of the factual situation that occurred there, that there was circumstantial evidence enough to make that credible allegation that the juror had had an outside contact. So certainly, yes, I would say this could be a situation that credible allegations could be made through circumstantial evidence. But here there's just no evidence in our opinion at all that this juror had any contact with the reporter's tweets during the course of the trial. Well, I mean, that sort of begs the question. You said here there's no evidence. There's no direct evidence, but Mr. Lynn has argued that, in fact, given the nature of the technology, the most he could allege is this circumstantial chain of events that began with the pretrial Twitter activity and then continued with evidence that at least on two occasions during the course of the trial, the trial in which reporters were constantly tweeting information about the trial, that she engaged with Twitter. And as my colleagues have indicated, Judge Wynn and others, the nature of this technology is such that there's never going to be any direct evidence of someone who simply looks at his or her feed during the course of the trial. So that's circumstantial evidence. So what's wrong with that? I would respectfully disagree with that. There is no evidence whatsoever that this juror had any contact with that circumstantial. There's no direct evidence. I will grant you that. But, I mean, I just laid out a series of facts that I think suggest at least some circumstantial inference can be made that she, in fact, was engaged improperly with Twitter during the course of the trial. And that's essentially that kind of credible allegation is effectively what the Remmer hearing is designed to root out. Well, with regard to the pretrial activity, again, even if one considers that, that is a little late. It was an indication that, yes, she had knowledge about the case, but those tweets or the retweeting or the liking of those tweets that are of concern had to do with people other than these two reporters. It wasn't as if she was following and liking or retweeting those reporters. Perhaps if that had been the case, that might take it over the bar, and that might be some circumstantial evidence that she was actively following these reporters. There's no indication in those prior Twitter activities that she had involvement even then with those reporters. There's no indication by her Twitter activity following trial that she was interacting with those reporters and seeing those. I think if that occurred, yes. Excuse me. I didn't mean to interrupt you. I thought you were winding down there. Mr. McVeigh, you seem to have been saying, though, in your last statement there was evidence that she had been exposed to information about the trial. And we know that the trial judge found that she had been inaccurate or potentially untruthful about her exposure. Why doesn't that become a big fact that weighs into the mix? It's the same question I asked Mr. Lynn. We know we have a juror who had been exposed pre-trial and who didn't acknowledge that when she was at the trial. Why doesn't that become a big factor in whether the allegation of exposure during trial is credible? I mean, it seems to me to be circumstantial evidence of untruthfulness. Well, I would respectfully disagree that that's what the record shows. This juror was asked very specific questions about her knowledge of the impeachment proceedings. She was forthright. Wait a sec, though, Mr. McVeigh. Question number six is, have you heard anything at all from any source about the facts? She wasn't asked about the commission. She wasn't asked about the indictment. She was asked, have you heard anything at all from any source about the facts? And the answer to that is clearly yes, from what we know. Wasn't that question directed to the case, facts of the case? And the court was very specific in asking about the case and the impeachment proceedings. And there was no question. There was no question that was asked about the facts of the case. And then none of the tweets talked about the case. It wasn't even an indictment. It wasn't even a grand jury proceeding talked about. These were ethics violations and impeachment. And she answered that and said, yes, I did have knowledge of that. And so to the extent that she said I have knowledge of the impeachment and the ethics, she is acknowledging all the facts that she had. It's just not fair to say then when she's asked about facts of the case and the court made a distinction between the impeachment and the facts of the case in his questions. He actually explicitly noted that in his question. I'm now talking about the case. And she didn't answer yes to that. I agree with the counsel that the record does not support that she was disingenuous in answering those questions. And counsel knew of this. Counsel could have said, well, what did you learn about the impeachment? What did you learn about the ethics violation? Yes, I would. I agree with the assessment. There were specific questions asked about the facts of this case. There was a difference made between those. She fully acknowledged. Mr. McVeigh, how are the facts different? How are the facts of this case different from the facts of the impeachment? The task of her desk and the couch? Well, there's a couple of responses to that. At the time that the blood beer occurred, this juror would not necessarily have known what the facts of this case were. And so in order to know those specific facts, she doesn't know. She admitted and fully disclosed the fact that she was exposed to information about the impeachment proceedings. And remember, the one aspect of this case that was most publicized was an issue of Justice Loffrey and the cast over desk, which he took to his home. Judge Loffrey was acquitted of that particular count. The jury unanimously acquitted him of the count. That was one of the most publicized aspects of the overlap, if you want to put it that way, between the impeachment and the trial itself. So this juror parsed out those differences between what was happening with the impeachment and what was happening with the ethics proceedings. And in terms of the facts of this case, as it related to the criminal case, had stated she knew nothing further. Counsel, let me ask you this. I thought that the basic line that the Supreme Court has drawn in this area of law was between exposure on the one hand and the imposition or the intrusion of an outside influence on the other. And in case after case after case, the Supreme Court makes clear that exposure is unavoidable unless you want a jury which is composed of uninformed citizens, which you don't want. Today's media environment with a 24-hour news cycle, exposure is all the more unavoidable. The Supreme Court has made the point that you can't reason back from the mere fact of exposure, even detailed exposure, to bad faith. And of course, why is it meant to address that? Now, when you move from exposure, and I think Judge Richardson made this point very well earlier, because when you move from exposure to the intrusion of an outside influence, then the case begins, it seems to me, to take on a wholly different dimension. But in the absence of an outside influence that's being brought to bear on her, you have to, as Judge Qualbaum has said, leave these kind of things up to the district court, because that's exactly what the district court's assessment and its voir dire and its greater familiarity and arrest is supposed to have confidence in. But as I understand it, this line between exposure and intrusion of outside influence has an important distinction in the Supreme Court's jurisprudence for many years. That's correct. It would be difficult to ever see the jury in a case that was highly publicized such as this one. And yes, this juror had outside knowledge about facts that may have been overlapping with regard to the impeachment and the ethics proceedings. And when you're dealing with exposure, it becomes very difficult to draw lines, as I say, because everybody's exposed. It would have been highly unusual of a trial which was this well-publicized in this much of a public issue in West Virginia. It would be odd if people were exposed. But that's a different thing altogether from somebody trying to exert an outside influence upon a particular juror, which seems to me a much more serious problem than the mere fact of exposure. And as I understand the record, I don't think that there was a kind of outside influence brought on this jury by anyone. And that to me, when that line is crossed, that's a real red flag for me. But where we're just talking about exposure, I know the Supreme Court said you don't want a completely unexposed juror. They're probably lacking in a whole lot, including life experience and an interest in civic affairs. I would agree. And in this case, there's no evidence whatsoever that, at least during the trial, that there was any exposure to any outside influence. And that's the issue here for this court to consider, is whether or not that credible allegation under Remmer was made of that contact during trial. And there's just no evidence whatsoever of her exposure to that. And I apologize, my screen is not showing a time, so I'm not sure how much I have left. Counsel, you have four minutes left. All right, thank you. Counsel, can I ask a question? Is it relevant here that the district court during the trial gave admonitions not to look, to stay away from reports, media reports or whatever, about this case, as opposed to stay off social media altogether? And I guess another related to that, had the district court given instructions to the jurors to stay off social media altogether, and there was evidence that a juror was on it, would that produce a different result? I believe it would. All the court's instructions, and they were fairly detailed, and every day and at every break, was instructing them to stay away from news accounts. And there was a general instruction about newspaper, television news, as well as social media. There was instruction about that prior to the case actually starting, and they were, again, reminded of that daily, and certainly more than once daily, to stay away from news accounts about the case. And it was instructed, too, if for some reason they accidentally came upon those, to immediately turn those off, ignore those, or whatever. Can I ask you about the second part of Judge Quetelbaum's question, in which you said, yes, if the instruction had been, don't go on social media, and this juror did, would that produce a different result? Is that right? Judge Mosk, you trailed off. Could you repeat your question? Yes. I thought, and this was going off of the end of Judge Quetelbaum's question, and he can correct me if I've misunderstood his question. But I thought I understood your answer to be that if the juror was instructed not to go on social media, and then it was learned that the juror did go on social media, that would require a bribery hearing. Not in and of itself, no. Well, you said that would be a different case. The big difference is whether it was a bribery hearing or not a bribery hearing. Yes. I may have misunderstood your question. It wasn't my question. Judge Quetelbaum, was that not your question? Yes, I was just trying to see what the government's position was as to whether the evidence involved violation of the district court's admonitions, how that factored into the inquiry. That seems to be, that's my whole thing, that there would be a different case, it seems like, because you have improper conduct from which you could have circumstances that they may have been exposed. But the gateway still is improper conduct. Okay, but what I'm trying to understand I'm not coming to you, Judge Mosk. I'm just talking about, you're really misunderstanding whether it's a different case. Yes. Now, you'd have to admit it. That does make a difference. Does that make a difference if you get a bribery hearing in? Yes, I believe it would. That's what I mean. But just a minute, you know, the jury were never instructed to stay off social media. They were instructed to stay off social media about the case. That's correct. That's Judge Quetelbaum's point. Yes, and I mean, if somebody gets on and says, I'll pick you up after school tweeting to a daughter or whatever, that wouldn't violate any instruction and wouldn't be relevant. And in this case, the only tweets we have are two relating to football. Thank you so much. Thank you. Excuse me, Chief, I'd like to ask a question before we conclude, if you don't mind. Sure. I just want to delve a little bit in terms of where we are in terms of kind of delving between what the technology is here. This whole business of following and not following, there seems to be an allegation from at least Mr. Lynn's position that there was at least a following that was going on during trial. You don't seem to dispute that. And so when we look at this, I think about plenty of jurors indicate they have no exposure. We can get into the lawyer question that well where the specifics, whether she really specifically asked the question. I don't think we want to go down that road of saying jurors can be tied to a specific question with specific lawyer-like answers to them when we know what the purpose of this whole overarching duty is. It's a fair trial. It's to make sure you're not exposed to things of that nature. But there is a difference between pretrial exposure, which is fair game during voir dire, and exposure during trial. And obviously we do want an educated jury, one that's interested. But we don't want them reading about the case during the trial. And if there is evidence here, she is following, and as you indicated, two reporters who are reporting constantly on this particular case. And this is no ordinary case. This is not the little bank robbery down the street that someone has to be doing and she's following. This is a case that's all in the media, as I understand it, and they are constantly reporting on it. And there may be a difference in a case of this magnitude and one that's not of this magnitude, but Rimmel was decided in 1954, 67 years ago. I have every confidence they had no clue what our following on Twitter and even our Internet was back then. And yet we as judges now ask to apply what we hope to be illuminating rules then that would fit differing circumstances and different situations. What we confront today is a simple question. And I think it is when you look at it, why don't we have a hearing? I'll end by asking this question. How long would such a hearing take in this instance in your best guesstimate? This is one instance I'll ask you to give a guesstimate because I'm not seeing a long hearing at all for this sort of situation. And then secondly, is there any dispute as to the fact, as to the allegation that she was at least following, whether passive or actively, during this trial? With regard to your question about the length of the hearing, I would say probably no more than an hour, if that. And there is no dispute that she followed both reporters on Twitter. However, what is not seen is that she actively followed them. There is no evidence whatsoever at any time that she... Let me just ask the counter question. Is there any evidence that she did not actively? We do know at some point she did. Is there any indication she did not? Well, the indication that she did not is there's nothing to show that she engaged with them. She did engage with other... I understand that, but you don't have to engage to follow actively, do you? You don't. And I mean, so when you say engaged, there's no light up there. People follow Twitter tweets actively all the time, and they don't engage at all. Is that not correct? That's correct. So my question is that, let me... Please, Judge Niemeyer, if you don't mind, I'd like to continue this line of questioning because I think the technology here is something important for this court to understand. When we are applying rules from a 1954 case in 2021, and while I appreciate the different perspectives here, I see the potential for an explosion of an abuse on the part of those who are coming to judge and give fair trials. The first question, when you go into specifics, you know, did you specifically ask about impeachment? Did you ask about this? You know, the whole thing is, were you exposed? I mean, you know, is there something here that can influence your decision here? I mean, we can get beyond the lawyer. We're talking jurors. And so then we get into the business. We've got two active reporters reporting every day. She has followed them actively. We don't have evidence that she's followed them actively here during the trial, but we don't. She is or not. So then we get to the question, should there be a hearing? You say an hour, but candidly, I think, admittedly, you say it's probably less than an hour. I probably think 15 minutes to 30 minutes would be it for the termination of an issue of this magnitude. So that's where I've gone with this. How do you respond? Well, Your Honor, a couple of respects. Number one, Remmer still is the law, and Judge Copenhaver in the district court reviewed everything that was before him with regard to this particular case. And that's what this concentration is on. He reviewed all the evidence that was provided to him. He considered everything that happened during the course of the trial, considered all that we've discussed today. And determined that under Remmer, a hearing was not required. And in order to show that a hearing would be required, we'd have to see that Judge Copenhaver abused his discretion in carefully considering all matters before him or the matters that weren't before him, particularly any evidence whatsoever that this juror had actively engaged or even passively engaged. There's no evidence that she passively engaged with Twitter. There are a number of feeds that come up. There's no information whatsoever that she was engaged with anything, particularly with regard to these two reporters. What was the evidence that she followed these reporters? I'm sorry? What was the evidence in the record that she followed these reporters? Well, there was evidence presented by the defendant that that was part of a number of people or entities that she followed during the course of Twitter. But there was nothing... Let me just go back to that. Do any of those Twitters show her following the reporters? No. Hey, that's the question. The question's not the allegation, but what is the evidence? There's none. There's no evidence of it. Have you ever said that before? It seems like that's the first time I've seen that. You seem to indicate when that allegation was made, did you dispute the fact that the allegation or the statement was made that she was followed during trial? I think there may be a confusion as to what following means. I mean, she follows these reporters. The question is whether or not during the trial she actually saw what was being said through her Twitter account. My question is what is the evidence she followed the reporters at all, at any time? What's the evidence? She has tweets during the trial. Is that not the evidence? No. Not to the reporters. Not to the reporters. Not to the reporters. You can tweet, but you don't have the following about the tweet. My question is, is there any evidence she followed these two reporters at any time? The only evidence that was presented is the allegations of the defendant and their pleadings with the district court. Thank you, Mr. Chairman. Did you dispute that? Did you dispute that? I thought you conceded it in front of us. We did not. Yeah, I did too. Yes. I'm sorry, what's your answer? Yes, that's correct. That you do concede it? Yes. You conceded it. You conceded it if it's not been demonstrated. How much is just not disputed? It's just not disputed, yes. That's what I thought you meant. That's a different word than conceded. That's a very different word. You said you conceded. Look to me as though you did. You didn't dispute it. I can tell you that. Only the best evidence against it is coming from the judges here who questioned it, but you didn't do that. I don't know where that's coming from. The question is, though, on the abuse of discretion, what the district court had as evidence before it. Yes. Isn't that the issue? That is the issue. Right. Okay, thank you so much, Mr. McVeigh. We appreciate it. Mr. Lynn, you have some time reserved. Thank you, Chief. I'd like to start with the abuse of discretion standard. I think what's important to point out here is that Judge Copenhaver did not apply the right standard. He did not even quote the phrase credible or genuine allegation. He focused entirely on sort of a brand of what Judge Qualibon was asking about, which was whether there was a violation, a proven violation of a jury instruction. A proven violation of a jury instruction, I think, would be very strong evidence in favor of a Remmer hearing, but I don't think it is required. Remmer protects against an extrajudicial contact. It protects the Sixth Amendment. It does not protect against a violation of a jury instruction. So there is some dispute here about what the jury was instructed on. Obviously, it's a record, but I don't think you have to have a proven violation of a jury instruction to get a Remmer hearing, and that is the analysis that Judge Copenhaver did. Mr. Lynn, let me ask you this question, because Judge Wynn is a guru about the cybernetics and the evidence, so I don't have the knowledge he has, but let me ask this question. I like simplicity. He tried to make this thing live in terms of 1954, a long time ago, and now the world is. But isn't it similitude saying that if a juror read the newspaper about the story about the impeachment just an incredible amount of times, 11 times or whatever, but then at the trial said, whatever I read about the impeachment, not ask about this trial facts, but about the impeachment, I can set it aside and do that. And if later we found out that that juror did not end her subscription to the newspaper, that would be circumstantial evidence that she must be still reading about it? No, Your Honor, I think there's a couple differences there. What's the difference? Well, the first, I think, is that the question in the voir dire, can you put aside what you said before? I don't think, even if you take that question at face value and give it the full weight, Your Honor, that you're suggesting, that's not a question that says, and are you going to stop reading the newspaper? The question that you pose in your hypothetical is, can you put aside the things you read before? You don't follow what I'm saying. You put aside that. I'm saying, though, because that's what you're doing. You don't have the improper conduct. You're saying because she still follows, that that means that's enough circumstantial that she must have continued to read it. I'm saying, couldn't you make that same circumstantial evidence, the fact that she didn't end her subscription during the trial? No, Your Honor. It doesn't make logic? No, Your Honor, and I think there's a difference. Okay, then why not? Deal with the logic of that. You tell me why that's not the logical extension of that. Of course. I think the analogy that would be more apt in your situation, if she maintained her subscription, would be, did she maintain a Twitter account? That would be the logical. But here, what we have evidence of is that she actually got on Twitter on multiple. So something closer to that would be that she... But the fact, though, is, Mr. Lynn, I know a little bit about Twitter, just a little bit, but if you follow someone, it simply means that in your Twitter app, you can get their tweets. But that doesn't mean that every time you go and make a tweet, unless you scroll through all your feeds, you're not necessarily reading who you follow. For example, you're going to get, on most iPhones, you maybe get two or three of the recent tweets. You would have to scroll into your feed. In other words, so you're making a lot of inference on top of inference that you're saying that every time she tweeted, before she tweeted, she went through all her feeds, found that, read it. You see what I'm saying? Obviously, this is a very important case, but it seems to me there's no real limiting factor as long as follow doesn't mean follow me like I'm reading everything. It means I have access to an algorithm that Twitter allows me to get those tweets, and you can also get tweets that are related to the same subject that people may have done. That could be an injure. With respect, Your Honor, I disagree, and I think it's... What did I describe about Twitter that you disagree with? I don't disagree with what you said about Twitter. I think the facts here are different. I think it's not just a juror who has an active Twitter account who may or may not have gotten onto Twitter. What we have here is we know the juror was on Twitter on multiple days. We know that these individuals tweeted 73 times between them, which is a lot, and that means that their tweets are showing up more often. We know that she had the proclivity and the inclination and the interest to look for and read tweets about Justice Loffrey. I think those are the facts that make this different from the case that you're worried about, Your Honor. Well, those are not the facts because we just established the record did not show she followed the reporter. There's no evidence that she followed the reporter. So what she did do is she followed some news stories or some individuals during the summer four times in four months, and it was about the impeachment and the ethics investigation. And we have evidence that she did not follow them even after the trial. There is zero evidence that she followed these reporters. And you're trying to suspect that because she used a tweet, looked at some news during the summer, she therefore tweeted these reporters during trial. It just doesn't follow. Your Honor, it was alleged that she followed them because you can see on her Twitter account that she follows. Where's the evidence of that? That's my point. I couldn't find any evidence. And I'm asking you, where is the evidence that she followed Bass and McElhaney? Your Honor, we allege that the government didn't dispute it, just as the government did not. That is not a fact. I want to see the fact. Do you have a fact in the record? I don't have the JA site here, but we do. There is none. You happen to know the record, don't you? I do, Your Honor. And is there a single tweet where either Bass or McElhaney is being read or tweeted or okayed or looked at? Your Honor, there is no dispute here that there is no Bass or McElhaney tweet that she liked. They didn't dispute it, but it's still no evidence. In other words, you're saying basically that doesn't matter because his other arguments were better. But my question to you, and I'd just like you to answer the one question, does the record show that she followed these two reporters? I don't believe there is evidence in the record of her following. Now, I think it is important to point out the difference between following and a public like, which we've talked about, I think, at length today. I understand that, but that doesn't create the evidence. That's a possibility. The evidence is what we're looking at in the record, and your allegation is continuous that she followed these reporters who were reporting regularly every day. That was your allegation. Yes, Your Honor. We have zero evidence of that. That was our allegation. It was undisputed, and I think it's also important to remember. Well, that's sort of the nerve of what this is about. You make an allegation that's undisputed, and then you don't have anything else. But really, what we're getting at, if you want to use the analogy, it's been brought up on a newspaper, and the whole business is, yeah, she's getting a newspaper, but we know she's reading a sports section. And here's where we're having a difference of opinion. It's correct. But the question we don't know is she's scrolling through and seeing everything? I mean, she could have, and that's the key issue here, is that she could have. She's got a newspaper in her hand, and we know she's looking at the sports space on this day. And we also know the pre-trial evidence and the whole bit here. And the question is, could she have gone through and gone through it? That's all around the hearing stone. I don't know why this is so difficult to simply say, let's just have a small hearing to find out if she did. The question of the following stuff, we can go on all day long. We all know she didn't unfollow. There's no evidence here unfollowing has occurred. So the evidence points in the direction she's following, which is why the government hasn't disputed it. And while we can go to the direct evidence of following, yeah, we can try to find that. We don't need that in this instance, because this is not a question of whether or not you are guilty or innocent. It's not a question of that. It's a simple hearing to ask a question, did you look at those other sections while you were going through this newspaper? That's all it is. Chief, I see my time has expired. If I could just wrap up with one sentence or two sentences. Oh, sure, sure, absolutely. Thank you. Unless there are further questions, I don't know. Mr. Lynn, I do have a question actually about this evidence issue. So, I mean, you would have been, I assume, if you had been put to the test, you would have been able to prove that, in fact, this juror was following these reporters, but you were relieved of that burden by the government's concession. Isn't that right? Yes, Your Honor. I was not trial counsel, but, yes, I think that applies. Are you really saying that? Are you really saying that? If you didn't have evidence, you didn't put it on? Well, you've got to be very careful with that response. No, no, no. What I said was, I suppose the lawyer could have been put to that test, but he wasn't because the government conceded the point. So, why did he need to put on evidence? I want to know what evidence the defendant had at that time that she reported. What evidence did you have in your bag that you didn't put on because of the government's statement? Your Honor, I don't know what trial counsel had at the time. Well, let me ask you this. Do you have any knowledge at this time that there was evidence? I don't have knowledge of what he had, but you can. We did have access to her Twitter account because her Twitter account was public. You can click on the link. And it doesn't show that she was a follower of these reporters? It does. Her Twitter account did show that she was a follower of these reporters. There's a banner at the top and it says, follows. You can click on that and it shows the list of individuals. Where is that in the evidence? Just think about it. That page is not in the evidence, Your Honor. Let me ask that on this because I think this is where we're going on it. The questions Judge Niemeyer asks are good questions and the government should have done its job and maybe asked those questions. The question is whether we do. But that evidence is public information, isn't it? Isn't it already out there? Yes, it is. You can find it right now. So if it's out there, I'm telling you the government made the decision because it was public information out there. This is nothing hidden and now it's gone. I think you can go find out now. Is that not correct? I want to ask that question, Judge. Can it not find out now? I believe if your Twitter account is still public, which we believe that it is, yes, you could find out about it literally right now. So you can't get hung up on that point because that is out there. It was out there during the trial and there's an obvious reason why the government didn't concede it, so to speak, because it was there. But the following is really not the issue here. The following, if we really get hung up on, well, is this evidence enough where you don't know, is it enough now to conduct a hearing to find out? That's where we are. It's not a question of the following. There's no question that she followed. Well, we're having a semantic debate over following and what that means. I mean, I follow certain sportswriters in the Daily Paper and the Washington Post and I look for their columns and I look for their reports. I follow certain comic strips on a day-to-day basis. And I don't see anything particularly wrong with that because I like certain reporters and I come to trust their bylines and I come to trust their columns and what their take is. And I suppose that would be, in common parlance, I would be following them. But I think there's a certain amount of ambiguity and obfuscation as to what follow means. And they're perfectly innocent ways to follow people. Your Honor, if I could answer your question as directly as I can. Following has a particular meaning on the Twitter platform. It means that you have chosen, you actually have to click something for a particular individual's Twitter account. And that means that the algorithm, which we don't know how it works. It's private to Twitter, the company. That means that the algorithm will click the tweet by that person. If you don't follow the company as a formal Twitter master, those tweets don't show up in your feed unless someone has liked or retweeted that other individual's tweet. So following has a very specific meaning. Well, I understand that. But it also has a perfectly pre-Twitter meaning, which can be carried over to the Twitter universe. When you follow something, it doesn't necessarily carry a sinister connotation. I understood, Your Honor. We're not suggesting that. We're using following the Twitter vernacular. In other words, it's not a semantic discrepancy. It has a specific meaning in a Twitter account. It's like hitting the subscribe button from the perspective of a Twitter account. I think that's one very fair way of putting it, Judge Wood. Counsel, last time I gave you a minute and you took the chance to open the door up and let somebody else have a question. Now, do you have something else to say or are you going to do the same thing this time? I'm sorry, Your Honor. I will continue. Okay. I'm trying to be generous with you, but, you know, don't come too far with it, okay? Thank you, Your Honor. Go ahead. The last point I wanted to make is I think the government has conceded in his opposition argument today that circumstantial evidence can be enough. And he also said that you can consider pre-trial and post-trial activity on Twitter. And I think the difficulty here is when you put this against the Harris case, I think the facts here are far more compelling. And the last thing I will say is I think it is very difficult to imagine a situation in which there is enough circumstantial evidence of passive Twitter activity beyond what we have here. And if a hearing is denied here, the hearing will not be – no defendant will be able to get enough facts together to look into a juror's passive Twitter activity. Thank you. Thank you so much, Mr. Ling, and thank you, Mr. McVeigh, for your argument, your presentation. We appreciate your help on these thorny issues. And we can't come down and greet you as we would love to, but nonetheless, we appreciate you very much. We ask that you be safe and stay well. Thank you so much.
judges: Gregory, Wilkinson, Niemeyer, Motz, Agee, Keenan, Wynn, Diaz, Floyd, Harris, Richardson, Quattlebaum